See Siple's Estate, 35 D. & C. 489.

## Ginocchietti v. Lehigh Valley Railroad Co.

*Herman E. Cardoni* and *Allen Spangler*, for plaintiff.
*John J. McDevitt, Jr.*, for defendant.

PARRY, J., February 14, 1939.—The plaintiff brought suit to recover damages for the death of her husband who was killed at a grade crossing formed by the intersection

of the main line of defendant's railway with a private road leading from the highway at the south to some farm buildings at the north side of the tracks. Here as the railway line makes a long tangent, there is a clear view from the crossing of more than a mile in either direction. The highway known as the River Road runs parallel to and within 25 feet of the railroad for some distance, when it curves to the north and crosses the tracks by an overhead bridge hereinafter referred to.

The statement of claim set forth that John Ginocchietti, exercising due care, went on the crossing to separate two fighting dogs and then fell and lay dazed or unconscious in plain view of an approaching locomotive which, although there was ample time to stop it, was so negligently operated as to run into and kill him.

At the trial motions for a nonsuit and for binding instructions were overruled, the jury disagreed and the case is now before us on the defendant's motion for judgment on the whole record. Under these circumstances, the evidence must be taken in the light most favorable to the plaintiff who is entitled to the benefit of all reasonable inferences to be drawn therefrom.

Now to create liability on the part of the defendant, the engineman, in the exercise of due care, should have been able to see the defendant in a perilous position, in time to have acted in the light of such observation: Reagan et ux. v. Reading Co., 126 Pa. Superior Ct. 175, 179; Petrowski et al. v. Philadelphia and Reading Ry. Co., 263 Pa. 531. The only question for us is whether such an inference may reasonably arise from the evidence. This requires a somewhat detailed examination of it.

The decedent John Ginocchietti and Antonia Latore were working in Victoria Giovagnoli's tomato patch. Antonia's little dog, "not so big as a cat", was fighting a protracted battle with a "big watch dog", a bull dog belonging to Victoria. They fought from the patch to the road and along the road to the crossing. Antonia ran to rescue her dog and John in response to her call ran to

help Antonia. She followed the dogs from the road to the crossing and after struggling with them a few moments John arrived.

It does not appear that either of them obeyed the mandate of the crossing sign to stop and listen but Antonia was certain that they looked and that she saw nothing coming. While John was kicking at the dogs he fell over and appeared dazed or unconscious. Antonia tried to lift him but he was too heavy. She called for assistance but John was then rising. While helping him she looked and saw no train coming but when she had him half way up, the train was coming on top of her and she had to jump back.

She first said she saw the train almost at the bridge and it took twelve to fifteen seconds to get to the crossing. Then that her attention was attracted to the train by the wind from it. That she felt this rather than saw the train and she didn't see much till it was on top of her. Next that the train got there three or four seconds after John fell over unconscious. Then that he fell, unconscious, three or four seconds after he went on the track. Then that he lay on the crossing unconscious for twelve or fifteen minutes before he was struck. Then that he lay on his back three or four minutes. When asked how long all this had been going on she said it might have been three or four seconds, it happened so quickly, and finally, that the best estimate she could give was that "a few minutes —two or three seconds" elapsed from the time she got on the track until the train hit John.

Viewing this testimony in the most favorable light, while we cannot reconcile its contradictions it seems reasonable to assume that when the witness said minutes she meant moments, for she appears to explain that a few minutes is two or three seconds and to take her literally reduces her testimony to absurdity. Now it is highly pertinent to this inquiry to ascertain how long John was helpless for while an estimate of twelve to fifteen minutes might under certain circumstances impose liability, an

estimate of two or three seconds certainly would not. As such evidence will not support one conclusion to the exclusion of the other, and as the jury cannot be permitted to speculate about it, a literal acceptation of the witness's statements cannot help the plaintiff: Glancy v. McKees Rocks Borough, 243 Pa. 216, 219; Ranck v. Sauder, 327 Pa. 177, 180. But if we assume 'moments' for 'minutes', which is not unreasonable, since it is quite clear that the witness was attempting to describe a rapid sequence of events, the difference between twelve to fifteen and two to three seconds while not inconsiderable at least comes within the compass of a possible guess. This then, shows at most that the unfortunate John was on the crossing for a very short period of time.

The speed of the train is estimated from fifty to. sixty m.p.h. The one fact in the case that is free from dispute is that the overhead bridge referred to is 1670 feet from the crossing. Antonia said the train took twelve to fifteen seconds to get from the bridge to the crossing. At fifty m.p.h. a train travels nearly 880 feet in twelve, and nearly 1100 feet in fifteen seconds; while at sixty m.p.h. it travels 1056 feet in twelve and 1320 feet in fifteen seconds. It is apparent therefore that if the train hit John within fifteen seconds of the time he followed Antonia on the crossing, he must have observed it rapidly approaching if he had looked. The presumption of due care is rebutted if this is so, for it is vain to say a man looked and listened if in spite of what his eyes and ears must have told him he went on the crossing and was presently struck: Carroll v. P. R. R. Co., 12 W. N. C. 348; Tull v. B. and O. R. R., 292 Pa. 458; Ehrhart v. York Rys. Co., 308 Pa. 566; Hazlett v. Director General, 274 Pa. 433. It is a matter of judicial notice that locomotives do not move silently, Grimes v. P. R. R. Co., 289 Pa. 320, and the witness Manganello said she heard the train when it was over 1300 feet away.

But while the assumption that the witness used the word 'minute" as equivalent to 'moment' or 'second', gives

a more rational meaning to her language, the time John and Antonia were on the crossing still remains uncertain, and as her final estimate is two or three seconds, we cannot think it reasonable to draw an inference from such evidence that both she and the decedent were on the crossing for anything more than such a short period of time, before he was struck by the locomotive, as to make it apparent that they dared a perfectly obvious peril. In any case the evidence fails so to picture or describe the facts relied on to establish liability, as to enable a jury to form an independent judgment thereon: Harkins et ux. v. P. R. T. Co., 286 Pa. 465, 466; Mack v. U. S. Gypsum Co., 288 Pa. 9, 11.

The next witness, Victoria Giovagnoli, was described by Latore as being a few steps away when she called to her for assistance. Victoria was standing by a cold frame at the greenhouse which she insisted was fifteen feet from the crossing although scaling the distance on the plan shows it to be thirty feet. In response to Antonia's call she rushed to her assistance. She looked up the track before she started to run and there was no train in sight, although she could only see to the bridge as smoke was coming from beneath it. She said it took her twenty seconds to run to the crossing and when she got there the train was but 150 feet away so she could do nothing. Her estimate of speed is hardly consistent with her statement that she rushed in response to an urgent call, for moving at the rate of thirty feet in twenty seconds it would take her more than fifty-eight minutes to cover a mile. She first saw the train when it was coming toward her 150 feet away but she estimated its speed at fifty to fifty-five m.p.h. But at whatever rate of speed Victoria progressed, if the train was not in sight when she started, it had to be beyond the bridge more than 1670 feet away; and since it covered all but 150 feet of this distance while she was going about 30 feet, it must have gone 1520 feet or 50-2/3 times as fast. It can only be upon the theory that

Victoria was crawling to the assistance of a helpless man at the rate of a mile an hour, that the notion that the train was out of sight when she started, can be accepted. But this is wholly inconsistent with her statement that she came rushing to the rescue and if she ran as much as five yards in a second, a fairly deliberate speed for so short a dash, the train would have to go at the rate of over five hundred m.p.h. to get from the bridge to a point 150 feet short of the crossing.

Viewing this evidence in the most favorable light we are at a loss to discover what reasonable inference we can draw from it to help the plaintiff.

". . . it would be a travesty upon justice to allow a jury to consider such testimony and a license to them to render a false, instead of a true finding. Such testimony is either intentionally false or mistakenly so; and, in either case, the court should instruct the jury to disregard it": Bornscheuer v. Consolidated Traction Co., 198 Pa. 332, 334.

Unless the danger was imminent no reason appears for Antonia's screams or for Victoria's race to help her, but with this implication it is impossible to evade the conclusion that the train must have been in sight when she started to run.

Mrs. Manganello was walking along the river road with her baby about three hundred feet from the crossing in the direction of the bridge, when she saw the engine coming up near the bridge. She did not see the accident nor did she see John go on the crossing. At the only moment of time when she noticed him, he was on the crossing chasing the dogs, "trying to grab them". She looked away and saw the engine, about two hundred feet from her; she waved her hand to the engineman who seemed to be reaching for something. He had his head out the window and was looking straight ahead; the train was going fifty to sixty m.p.h. She says her idea in waving to the engineman as he passed was to warn him that people were on the crossing, but as he was looking straight in that

direction such a gesture if he noticed it could do no more than distract his attention. The evidence of Mrs. Manganello will establish, that when she saw John he was on the crossing in the possession of all his faculties, that the train was about five hundred feet away from the crossing moving toward it at fifty to sixty m. p. h. and due there at the lower rate in about seven, and at the higher rate in about five seconds. This evidence, to say the least, does not help the plaintiff's theory of liability.

Nevertheless upon all the evidence the plaintiff contends:- That it was broad daylight; that the engineman admits he was looking ahead; that the crossing was in sight for some 1600 feet; that the decedent was lying helpless for about fifteen seconds and the train could be stopped for it was stopped in 300 feet. That under these circumstances the engineman was guilty of wilful and wanton negligence. The answer to this is that there is no evidence that the accident so happened. A theory cannot be accepted as to how an accident might have occurred when the evidence fails to support such a theory: Lessig v. Reading Transit and Light Co., 270 Pa. 299. There can be no presumption against facts that are proven: Snyder et al. v. Penn Liberty Refining Co., 302 Pa. 320. The plaintiff must stand or fall on the case as she made it: Young v. Gill, 103 Pa. Superior Ct. 467.

The sum of the matter is this: that even if we assume that the decedent went on the crossing in the exercise of due care and became incapacitated through no fault of his own, we are left without any information at all as to the proximity of the train when he became dazed or unconscious. Until that moment of time the engineman had the right to assume that the pedestrian would move off the track when the train approached and until it became apparent that he was unable to do so, there was no duty on the engineman to stop. With this essential fact missing, the evidence lacks any circumstance or combination of circumstances from which it can reasonably be inferred,

that when the engineman, moving at from fifty to sixty m.p.h. was able to apprehend that there was an emergency, he was a sufficient distance away to bring his train to a stop.

This is well illustrated by the case of Custer v. B. & O. R. R., 19 Pa. Superior Ct. 365, 206 Pa. 529, where a team of horses was stalled on a grade crossing shortly before an express train was due. An effort was made to stop it by setting a signal. The train came into view 4400 feet from the crossing, running sixty m.p.h. and the engineer, who testified that at this speed it would take from one half to three quarters of a mile to make a stop, was unable to do so. It was contended that an inference of negligence arose in that either (1) the speed of the train was so excessive as to prevent the engineer from stopping; or (2) that the engineer was negligent in not being observant of the signal to stop.

It was held first that proof of excessive speed alone was not sufficient to take the case to the jury and second; that even if it were reasonable to charge the engineer with notice at the first moment of possible vision he would only have forty-five seconds to see the horses, the signal, to put his braking appliances in action and to bring his train to a stop. The signal did not govern the crossing, but was beyond it and controlled the next block, while the presence of the horses on the track at the crossing three quarters of a mile away did not necessarily mean to the engineer that they were incapable of moving. There was no evidence that the engineer did not use his utmost efforts to stop as soon as he comprehended the danger. The judgment of nonsuit was affirmed by the Superior Court and upon the allowance of an appeal the Supreme Court sustained the affirmance.

We cannot escape the conclusion that the testimony for the plaintiff is not only confused, is at times contradictory and in part incredible. It has little if any probative value and is altogether lacking in the essential ele-

ment required to support a finding of the defendant's negligence.

We think therefore that the motion for a nonsuit should have been granted and if the defendant's evidence failed to take the plaintiff's case to the jury, the motion for binding instructions should have prevailed.

On behalf of the defendant it was shown that the decedent was killed a short distance below the crossing as he suddenly walked in front of the engine when it was about 150 feet from him running at the rate of about thirty m.p.h. That the emergency brakes were instantly applied and the train, which consisted of an engine and caboose, stopped in about 300 feet. While for the purposes of this motion we accept the account given by the plaintiff's witnesses, we may take from the defendant's evidence anything that appears in the nature of an admission helpful to the plaintiff.

But there is nothing therein to indicate that the engineman was inattentive to his duty. He says he was looking ahead and the plaintiff's witness says the same thing. He says that when the emergency arose he stopped as quickly as possible and there is nothing in the plaintiff's evidence to raise an inference to the contrary. The trial judge should therefore have affirmed the defendant's point for a binding direction.

We have not overlooked a dispute of fact with regard to certain requisite signals. The defendant's witnesses all said that the whistle was blown and the bell was ringing, while those for the plaintiff maintained that they heard neither whistle nor bell. We think this rose higher than negative evidence for the plaintiff, for one of her witnesses at least, said she could have heard such signals had they been given. This question was for the jury, but the case does not depend on it and it was not the negligence asserted or relied upon.

The motion is granted and judgment for the defendant upon the whole record is hereby entered, with an exception to the plaintiff.